**UNITED STATES DISTRICT COURT**
**Middle District of Florida**
**Tampa Division**

**Case No.**

DAVID & ANN CLARK, PETER GILLIS &
MARY PISCITELLI, DONALD & CAMILLE
GILLIS, PATRICE DE LANGSDORFF,
STEVE & CYNTHIA ENGQUIST,
ALEXANDER C. & JENNIFER K. HERWIG,
ALEXANDER C. HERWIG, TRUSTEE OF
THE JORDYN TRUST DATED MARCH 3, 2005;

Plaintiffs,

v.

FIFTH THIRD BANK, FIFTH THIRD
MORTGAGE COMPANY; and
BENCH MARK, INC. OF SOUTH WEST FLORIDA;

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

 Plaintiffs, DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD

& CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST,

ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF

THE JORDYN TRUST DATED MARCH 3, 2005, by and through the undersigned counsel, sue

FIFTH THIRD BANK, FIFTH THIRD MORTGAGE COMPANY, and BENCH MARK, INC.

OF SOUTH WEST FLORIDA, and state as follows:

## I.  GENERAL ALLEGATIONS
### A. INTRODUCTION

 1. The present action arises from a scheme created and implemented by the so-called

"developers" of the Clearwater Cay Clubs Resort in Clearwater, Florida – in concert with a

group of "preferred lenders" and "preferred appraisers" – to sell securities in the form of investment contracts ostensibly centered around purchase and sale agreements for converted condominium units and membership fees, coupled with leaseback agreements relating to a condominium called the Clearwater Cay Clubs Resort in Clearwater, Florida. Indeed, the case of Jeffrey Slayeter, et. al. v. DC 701, LLC., et. al., Case no. 8:07-CIV-01903-T-24-EAJ, currently pending in this very division, was brought against the developers of the Clearwater Cay Clubs Resort and others (the "Cay Clubs entities").

2.      As set forth herein, it is the borrower who is particularly victimized by fraudulent lending practices and appraisals as they agree to financially bind themselves – often times for decades based upon the integrity of the appraisal and the lending process. Despite the critical role played by appraisers and lenders who must adhere to these principals of independence and integrity, Fifth Third and Benchmark have abdicated their respective roles in providing third party unbiased valuations of properties to the Plaintiffs. Instead, Fifth Third and Benchmark chose to compromise that independence by permitting fraudulent appraisals to be used to entice the Plaintiffs to purchase and close on their loans.

3.      Further, despite a myriad of warning signs apparent to Fifth Third concerning the illegality of these transactions, Fifth Third chose to permit its loan officer(s) to close these real estate transactions and enjoy the profits and commissions generated from these loans. Sadly, Fifth Third's profits are determined by the quantity of the loans they successfully close, and not the quality or accuracy of these loans. Accordingly, there is an incentive for a lender and their loan officers – who are often paid by commission – to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the property's value. Indeed, Fifth Third's loan officer in charge of closing Cay Club loans – Roger Windey – had a

strong personal incentive to pressure Benchmark to value these units at the maximum possible amount.

4.     In order to induce Plaintiffs to finance their investment in the scheme, Defendants intentionally and/or in reckless disregard for the truth made numerous material false and misleading statements and omitted material facts.  Significantly, the Defendants herein omitted to disclose or misrepresented critical facts going to the very nature of the grandiose development plan being promoted, including, among other misrepresentations, facts concerning: a) the nature of the "loan packages" being offered to potential purchasers; b) the overall "value" of the purchase and of the development as a whole; c) the ability of the developers to construct the as-promised amenities; and d) the true market value of the units being sold.     These misrepresentations/omissions, and others as outlined herein, were relied on by Plaintiffs in selecting the Defendants to finance their purchase at the Clearwater Cay Club Resort.  As a result of these misrepresentations, Plaintiffs invested in a substantially overvalued real estate development and suffered significant monetary losses.

## B.  JURISDICTION, VENUE AND THE PARTIES

5.     This action arises under various Florida common law theories, including, but not limited to: rescission/fraud in the inducement, fraud, contribution/indemnification, and negligent misrepresentation.

6.     Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. §1332(a) and 28 U.S.C. §1367(a) as all claims asserted herein arise from the same nucleus of common facts.

7.     Venue is appropriate under 28 U.S.C. §1391(a) as a substantial part of the claims raised occurred in this District the underlying real property which is the subject of this action is located within this District.

## PARTIES

8.    The Plaintiffs join in this action as their claims arise from the same series of occurrences and share common questions of law and fact.

9.    Plaintiffs, DAVID & ANN CLARK, (the "Clarks") executed a Promissory Note and Mortgage in Monterey County, California, reside in Monterey County, California and are otherwise sui juris.

10.    Plaintiffs, PETER GILLIS & MARY PISCITELLI ("Gillis and Piscitelli") executed a Promissory Note and Mortgage in Contra Costa County, California, reside in Contra Costa County, California and are otherwise sui juris.

11.    Plaintiffs, DONALD & CAMILLE GILLIS (the "Gillis'") executed a Promissory Note and Mortgage in Alameda County, California, reside in Alameda County, California, and are otherwise sui juris.

12.    Plaintiff, PATRICE DE LANGSDORFF ("De Langsdorff") executed a Promissory Note and Mortgage in Lee County, Florida resides in Paris, France, and is otherwise sui juris.

13.    Plaintiffs, STEVE & CYNTHIA ENGQUIST (the "Engquists") executed a Promissory Note and Mortgage in Hennepin County, Minnesota, reside in Hennepin County, Minnesota, and are otherwise sui juris.

14.    Plaintiffs, ALEXANDER C. & JENNIFER K. HERWIG (the "Herwigs") executed two Promissory Notes and Mortgages in Collier County, Florida, reside in Collier County, Florida, and are otherwise sui juris.

15.    Plaintiff, ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 (the "Jordyn Trust") executed a Promissory Note and Mortgage in Collier County, Florida, resides in Collier County, Florida, and is otherwise sui juris.

16.    Defendant, FIFTH THIRD BANK, (hereinafter collectively with Fifth Third Mortgage Company "Fifth Third") is a national bank organized and existing under the laws of the United States with its principal place of business in Cincinnati, Ohio. Fifth Third Bank does business in the State of Florida.

17.    Defendant, FIFTH THIRD MORTGAGE COMPANY, (hereinafter collectively with Fifth Third Bank "Fifth Third") is an affiliate of Fifth Third Bank operating through and under Fifth Third Bank, a national bank organized and existing under the laws of the United States with its principal place of business in Cincinnati, Ohio.  Fifth Third Mortgage Company does business in the State of Florida.

18.    Defendant, BENCH MARK, INC. OF SOUTH WEST FLORIDA ("Bench Mark") is a Florida Corporation doing business in Pinellas County, Florida.

## II. THE SCHEME UNFOLDS

19.    In or about 2004, the Cay Clubs entities purchased a waterfront apartment complex that had been converted into condominiums and began a sales blitzkrieg throughout the country promising the construction of a world class facility replete with office park, amusement park, high end shopping galleria, hotel facilities, a marina and resort style common areas.[1]  In

---

[1] During this 2004-2005 time period, the Plaintiffs received nearly identical scripted multi-media presentations and accompanying brochures designed by the Cay Clubs entities with input from numerous affiliates and salespersons – mainly Ricky Stokes, and Barry Graham – to induce them to invest in the Clearwater Cay Clubs.  The investment scheme created by the Cay Clubs entities promised substantial profits from the investment through: a) a guaranteed income stream via a "leaseback" (sometimes prepaid at closing) from a pool of short-term rental units purchased by investors and b) capital appreciation as a result of what the Cay Clubs entities represented would be a large scale conversion/development of the Clearwater Resort to feature such amenities as a newly constructed water park, high-

order to justify the enormous price of the units, the Cay Club entities promised short term nightly rental income during the renovation period, and immediate construction of the world class facilities. To garner support for their ambitions, the Cay Club entities promoted the fact that they worked with certain appraisers and lenders (one of which was Fifth Third) to ensure immediate closings with financing that would justify the purchase price.

20.    Specifically, the Cay Clubs entities offered to arrange 100% financing for Plaintiffs with high credit scores as part of the "exclusive" deal if they used the Cay Clubs' "preferred lenders" – one of which was Fifth Third Bank and their loan "officer" Roger Windey ("Windey"). Further, investors were told that they need not worry about the Cay Clubs membership dues and closing costs, as these additional fees would be rolled into the final purchase price. Financing for these additional costs was possible – according to the Cay Clubs entities and Windey – because each unit was guaranteed to appraise for much more than the purchase price. Representations made by Windey to each of the individual Plaintiffs are as follows:

## DAVID & ANN CLARK

21.    When conducting the financing phone interview with Windey, David & Ann Clark were told that Windey processed most of the Cay Clubs loans "for its investors" and made most of his money from the sheer volume of Cay Clubs loans he did. Regarding the purchase itself, Windey told the Clarks that Fifth Third had been able to secure 100% financing being offered to the Cay Clubs purchasers "due to the great value" of the investment.

---

end galleria shopping center, an expansive spa and fitness center, luxury hotel, additional recreational facilities and gondola-traveled canals.

22.     Upon completing the initial phone call to Windey, the Clarks sent Windey their full financial picture, including all of their financial information and supporting documentation. The Clarks also deposited $100,000.00 into a Fifth Third Account as part of the requirements to obtain the Cay Clubs loan.  Based upon Windey's assurances of the "great value" of the purchase, along with 100% financing, the Clarks went ahead with the closing of their Unit 1230 of the Grand Venezia at Baywatch for $708,100.00 during June of 2005.  Joseph Goenner of Benchmark Appraisal Services had appraised the Clarks' unit at $730,000.00 – despite the fact that the appraisal was "subject to completion" of the purported, on-going remodeling and construction of the unit.

23.     Only recently have the Clarks discovered that a new, second loan application was mixed in with the original documents presented at closing.  This second loan application was not filled in by the Clarks and contained inaccurate information and figures concerning the Clarks' personal finances – including elevated assets and an elevated value on the properties they already owned.

24.     To the extent that the Clarks signed any closing papers that were inconsistent with the information they completed or provided, it was because Fifth Third – by and through Windey – engaged in the practice of "sliding" – that is, including documents in a transaction that the drafting party has reason to know that the person signing the documents would not question and have no reason to believe that false information would be included in the documents to the executed.

**PETER GILLIS & MARY PISCITELLI**

25.     Peter Gillis & Mary Piscitelli – much like their brother-in-law and sister, the Clarks – conducted a financing phone interview with Windey.  During the interview, they were

never asked for their income as they were assured by Windey that since theirs was a very low-documentation loan specially designed for Cay Clubs purchasers.  Pursuant to the special Cay Clubs "preferred lender" deal, Gillis/Piscitelli opened a checking account with Fifth Third in order to receive the special Cay Clubs "preferred lender" deal of 100% financing and no mortgage insurance – Windey even suggested that the funds used to open the $100,000.00 account could be replenished at closing with the leaseback payment.

26.     At all times material hereto, Windey represented to Gillis/Piscitelli that Fifth Third was in "complete support" of the Cay Clubs investment model and its management team – which is why Fifth Third had created the special 100% financing loan for Cay Clubs purchasers. Windey indicated that Fifth Third was aware that the purchasers would not control the property for the first two years, in addition to all the major improvements that the property would be undergoing during that time.  Windey further stated that Fifth Third was able to finance the membership fee into the loan since the value because the finished Cay Clubs product would see a significant increase in price.  Roger Windey even noted that he would purchase a unit himself were it not for Fifth Third's policy which prohibited employees from participating in the 100% financing program.

27.     After the sales pitch, various "visits" to the Cay Clubs Clearwater resort with Stokes, and Windey's assurances of 100% financing, Gillis/Piscitelli closed on their Unit 1136 of the Grand Venezia at Baywatch for $677,200.00 during June of 2005.  Joseph Goenner of Benchmark Appraisal Services had appraised the Gillis/Piscitelli unit at $680,000.00 – despite the fact that the appraisal was "subject to completion" of the purported, on-going remodeling and construction of the unit.

### DONALD & CAMILLE GILLIS

8

28.    Donald & Camille Gillis, the parents of Plaintiff, Peter Gillis, also "invested" in the Cay Clubs entities – encouraged by the promise of 100% financing.  During the financing phone interview with Windey, the Gillis' were never asked for their income as they were assured by Windey that they were applying for an "asset-based" loan.  They were only required to provide Windey with a schedule of any real estate owned, as well as an asset statement which reflected their assets.  Windey also opened the required checking account with Fifth Third in order to receive the special Cay Clubs "preferred lender" deal of 100% financing and no mortgage insurance.

29.    After the sales pitch, various "visits" to the Cay Clubs Clearwater resort with Stokes, and Windey's assurances of 100% financing, the Gillis' went ahead with the closing of their Unit 728 of the Grand Venezia at Baywatch for $728,700.00 during June of 2005.  Joseph Goenner of Benchmark Appraisal Services had appraised the Gillis' unit at $730,000.00 – despite the fact that the appraisal was "subject to completion" of the purported, on-going remodeling and construction of the unit.

## PATRICE de LANGSDORFF

30.    Much like the other Plaintiffs, Patrice de Langsdorff provided all of the information requested by Windey by way of a financing phone interview, as well as mailing him several financial status summary forms.

31.    After receiving 100% financing, de Langsdorff went ahead with the closing of both Unit 1214 of the Grand Venezia at Baywatch for $399,900.00 in February of 2005, as well as Unit 1124 of the Grand Venezia at Baywatch for $388,800.00.  Joseph Goenner of Benchmark Appraisal Services had appraised Unit 1124 at $420,000.00 – despite the fact that the appraisals

were "subject to completion" of the purported, on-going remodeling and construction of the units.

## STEVE & CYNTHIA ENGQUIST

32.    Steve Engquist entered into a contract for Unit 337 of the Grand Venezia at Baywatch for $502,100.00 in early 2005.  After the conclusion of telephone loan application interview with Windey, the Engquists were assured of receiving full financing at the Cay Clubs "preferred rate."  Consequently, the Engquists closed on their Unit in August of 2005, with funds that were loaned on the basis of an inflated appraisal contrived by Windey and Joseph Goenner of Benchmark Appraisal Services.

## ALEXANDER C. & JENNIFER K. HERWIG, ALEXANDER C. HERWIG
## ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST
## DATED MARCH 3, 2005

33.    Alex & Jennifer Herwig never met Windey personally, but rather provided all of the information requested by Windey by way of a financing phone interview.  Included as part of the information provided to Windey by the Herwigs/Jordyn Trust was a breakdown of their monthly income.  The Herwigs relied on Windey – as a loan officer for Fifth Third – to fill in all their information accurately.  Indeed, Windey assured the Herwigs that he would fill in any information that the Herwigs were not sure about

34.    In connection with the financing, Windey told the Herwigs/Jordyn Trust that Fifth Third and Windey would take care of everything with regard to the required appraisal to enable a quick closing on both units.  Windey assured the Herwigs/Jordyn Trust that a Cay Clubs investment was a "great deal" and he had processed hundreds of Cay Clubs loan applications

already.  Windey also assured the Herwigs/Jordyn Trust that he was very familiar with the Cay Clubs product as he had a unit there as well.

35.    Rather than selecting a local appraiser who truly was familiar with values in Pinellas County, Florida, Windey recruited Joseph Goenner of Bench Mark Appraisal Services located in Naples, Florida to appraise the units in the Clearwater Cay Club.  Upon information and belief Windey and Goenner also had a pre-existing business relationship.

36.    After receiving 100% financing, the Herwigs went ahead with the closing of both Unit 1116 of the Grand Venezia at Baywatch for $574,200.00, as well as Unit 430 of the Grand Venezia at Baywatch for $471,200.00, both during or about April of 2005.  Joseph Goenner of Bench Mark Appraisal Services had appraised Unit 1116 at $695,000.00 and Unit 430 at $600,000.00 – despite the fact that the appraisals were "subject to completion" of the purported, on-going remodeling and construction of the units.

37.    Only recently have the Herwigs discovered that a new, second loan application was mixed in with the original documents presented at closing.  This second loan application was not filled in by the Herwigs and contained inaccurate information and figures concerning the Herwigs' personal finances – including elevated monthly incomes.

38.    To the extent that the Herwigs signed any closing papers that were inconsistent with the information they completed or provided, it was because Fifth Third – by and through Windey – engaged in the practice of "sliding" – that is, including documents in a transaction that the drafting party has reason to know that the person signing the documents would not question and have no reason to believe that false information would be included in the documents to the executed

## **THE APPRAISAL**

39.     In connection with the financing, the Plaintiffs were told that Fifth Third and Windey would take care of everything with regard to the required appraisal to enable a quick closing.

40.     Rather than selecting a local appraiser who truly was familiar with values in Pinellas County, Florida, Windey recruited Joseph Goenner of Benchmark Appraisal Services located in Naples, Florida to appraise the units in the Clearwater Cay Club.  Upon information and belief Windey and Goenner also had a pre-existing business relationship.

41.     It was evident from the face of the appraisals that it was by no means a typical residential appraisal. Rather, certain provisions looked as if they had been lifted from a marketing brochure. For example, in one part, the appraisals all read:

> "The Baywatch is the perfect setting for those in search of a resort living experience. With your choice of one, two, or three bedroom classic garden villas, your residence will reflect your personal lifestyle.  With its five star amenities, The Grand Bellagio-Grand Venezia takes luxury coastal living to dizzying new heights while displaying is (sic) lush, tropical professionally landscaped grounds. Conveniently located between downtown Tampa and Clearwater Beach with easy access to airports, major highways, shopping, and recreation."

42.     The values set forth in each of the appraisals at the direction of Fifth Third and Windey were premised on the representation by Cay Club entities that the development would be completely renovated to become a "first class" resort.  The values arrived at in these appraisals far exceed the value of the units in their then existing (and present) condition by around 60%, without the represented renovations to the facilities. Fifth Third knew or had reason to know that such values were a misrepresentation of the true value and would be relied upon by the Plaintiff borrowers in determining whether to commit themselves to a high interest long term loan.

43.     Indeed, the Plaintiffs relied upon the appraisal which reflected that the units were worth sums in excess of the contract price and therefore Fifth Third would close on the transaction.    At all times material hereto, Fifth Third knew or should have known that the Borrowers would rely upon and did rely upon its furnished appraisal in determining whether to close the transaction and borrow monies from the lender.    Moreover, Fifth Third's appraisals used other units at the Clearwater Cay Club which closed shortly before the each other and were closed under the same fraudulent circumstances.

44.     Moreover, Bench Mark would oftentimes pass on the duties of being the appraiser for Fifth Third to various Cay Clubs employees (Jody Zartman, Kim Miller, etc.).    For example: Joseph Goenner visited the Cay Clubs Clearwater Resort in order to take pictures of each unit's window views and door numbers – but not the interior of the units, as these were under construction.    Whenever an appraisal for a particular unit was needed, Joseph Goenner would contact the Cay Clubs sales office and have a staff member go into the unit in question, take pictures of the interior, and submit these to him via email in order to complete the "appraisal."

## <u>SUMMARY OF WHAT FIFTH THIRD DID WRONG</u>

45.     Fifth Third failed to adhere to established lending practices when they failed to do one or more of the following with respect to the Plaintiffs' loans:

a.     Take appropriate steps to insure that the information provided by the Mortgage Loan Originator (Windey) was verified by the Loan Processor and by Underwriting;

b.     Enforce the processes and procedures that only sales support staff and/or processors order appraisals that are independent of the developer;

c.    Abide by underwriting requirements and exceeding the allowable loan to value ratio as established by an accurate and unbiased appraiser;

d.    Include in the closing package to be signed only those accurate documents reflecting real facts, figures and dates;

e.    Order/demand a follow-up appraisal after the completion of the pending construction noted in the appraisals as required;

f.    Verify that the properties in question were completed as represented and no longer under construction prior to closing on the loan.

46.    Accordingly, Fifth Third failed to act in the same manner as a reasonably prudent lender located in Florida.

## SUMMARY OF WHAT BENCHMARK DID WRONG

47.    The appraisals furnished by Benchmark present a completely inaccurate picture of the facilities and their estimated value.  The values set forth in each of the appraisals performed in connection with the loans procured by Plaintiffs to purchase their units were premised on the representation by the Cay Club entities that the resort would be completely renovated to become a "first class" resort.  The values arrived at in these appraisals far exceed the value of the units in their then existing (and present) condition, without the represented renovations to the Resort.

48.    The Plaintiffs further relied upon the appraisal which reflected that the units were worth sums well in excess of the contract price and therefore monies could be lent.  At all times material hereto, Benchmark knew or should have known that the Borrowers would rely upon and did rely upon its appraisal in determining whether to close the transaction and borrow monies from the lenders.  Indeed, the appraisals utilized the sales method valuation approach to

arrive at the market value of each unit based upon several other units at the Clearwater Cay Club which closed shortly before the each other and were closed under the same fraudulent circumstances.

49.     Moreover, a number of the "comparable" sales featured in Benchmark's appraisals were units that were fraudulently sold by and to the principals of the Cay Club entities for elevated prices.

50.     Benchmark failed to adhere to established appraisal practices when they failed to adhere to the Uniform Standards of Professional Appraisal Practice ("USPAP") which is incorporated into federal law.  See 12 C.F.R. Sec. 34.44 requiring appraisers to conduct their appraisals independently and without the accommodation neither of personal interests nor as an advocate for any party.

51.     Benchmark failed to adhere to established appraisal practices when they failed to actually complete the appraisals on a first-hand basis, but rather seek out shortcuts for completing appraisals requested by Fifth Third by ordering Cay Clubs Clearwater Resort staff members to take pictures of unit interiors which Joseph Goenner would use to finalize any requested appraisals.

### COUNT I - RESCISSION/FRAUD IN THE INDUCEMENT
### (as to FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY)

52.     Plaintiffs re-allege each and every allegation contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     Fifth Third – by and through Windey –fraudulently induced the Plaintiffs to purchase and incur large loans on the subject units based on false statements of material fact and omissions of material fact.

54. As set forth more fully above, Windey represented that Fifth Third would provide the necessary financing to ensure that the Plaintiffs made a significant profit on the units based upon the substantial demand for short term rentals at the complex, that Clearwater Cay Club was truly a great "value," and that Clearwater Cay Club would have the first class amenities referenced above.

55. Fifth Third Bank and Windey participated in the fraud by inflating the Plaintiffs' income and net worth figures in connection with the loan application, and/or they otherwise participated in the fraud by knowingly and willingly hiring Joseph Goenner of Benchmark Appraisals, who they knew had a pre-existing relationship with the Cay Clubs entities and would place an over inflated value on the unit.

56. Further, Fifth Third Bank and Windey committed fraud by representing to the Plaintiffs that they qualified for their respective loans when they never would have qualified for such a sizeable loan had the actual fair market value of the property been utilized and/or their income and net worth figures not been inflated.

57. The misrepresentations and omissions of Fifth Third were material and designed to induce the Plaintiffs to purchase their respective units.

58. The Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions, to their detriment in that they purchased their respective units.

59. Had Fifth Third Bank/Windey not misrepresented the value of the properties and the nature of the loans and adhered to established lending policies, the Plaintiffs would have never purchased their respective units.

60. The Plaintiffs continue to own their respective units with a value that is substantially less than the amounts financed.

61.     The Plaintiffs have suffered substantial out-of-pocket losses as a result of the purchase of their respective units, including monthly carrying costs, inflated real estate taxes, insurance, and financing costs.

WHEREFORE, the Plaintiffs DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 request:

(1)     rescission of the subject notes and mortgages;

(2)     compensatory damages against FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY, jointly and severally, with regard to the out-of-pocket damages suffered by DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005, together with pre-judgment interest;

(3)     attorneys' fees;

(4)     costs of this action; and

(5)     such further relief as the Court deems appropriate.

## COUNT II – FRAUD
### (as to BENCH MARK, INC. OF SOUTH WEST FLORIDA)

49.     Plaintiffs re-allege each and every allegation contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

50.     Bench Mark, through its actions as set forth herein, caused the Plaintiffs to purchase and incur large loans on the subject units based on false statements of material fact and

omissions of material fact.

51.     Bench Mark fraudulently presented a completely inaccurate picture of the facilities and their estimated value, partially "bolstered" by other Clearwater Cay Club units that were fraudulently transferred between the Cay Club entities' principal officers at high prices.

52.     Moreover, Bench Mark failed to adhere to "USPAP" in that it was not in fact, independent and devoid of personal interests.

53.     The misrepresentations and omissions of Bench Mark were material and designed to induce the Plaintiffs to purchase their units.

54.     The Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions, to their detriment in that they purchased their units.

55.     Had Bench Mark not misrepresented the value of the properties and the amenities/facilities available, the Plaintiffs would have never purchased their units.

56.     The Plaintiffs continue to own their units with a value that is substantially less than the amounts financed.

57.     The Plaintiffs have suffered substantial out-of-pocket losses as a result of the purchase of their units, including monthly carrying costs, inflated real estate taxes, insurance, and financing costs.

WHEREFORE, the Plaintiffs, DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005, request:

(1)     compensatory damages against BENCH MARK, INC. OF SOUTH WEST

FLORIDA, with regard to the out-of-pocket damages suffered by DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005, together with pre-judgment interest;

(2)     attorneys' fees;

(3)     costs of this action; and

(4)     such further relief as the Court deems appropriate.

### COUNT III – CONTRIBUTION/INDEMNIFICATION
### (as to BENCH MARK, INC. OF SOUTH WEST FLORIDA)

58.     Plaintiffs re-allege each and every allegation contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

59.     Bench Mark was the party solely responsible for the improper valuation of the properties purchased by the Plaintiffs, and was a major contributor to inducing the Plaintiffs to purchase their units.  Consequently, Bench Mark should be responsible for any damages incurred by the Plaintiffs.

60.     Plaintiffs now stand to be liable for certain alleged breach of note and foreclosure damages to their lender.

61.     Bench Mark, as the party solely responsible for the improper valuation of the properties purchased by Plaintiffs, has an equal liability for the obligations of Plaintiffs.

62.     It is axiomatic under Florida law that, should Plaintiffs be found liable for the alleged breach of note and foreclosure damages due to Fifth Third Bank, Plaintiffs will be

entitled contribution from Bench Mark for all or part of the amount claimed by Fifth Third Bank under the referenced note and mortgage.

WHEREFORE, the Plaintiffs, DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005, request:

(1)    that the Court declare BENCH MARK, INC. OF SOUTH WEST FLORIDA liable for all or part of the costs incurred by DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 with respect to FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY;

(2)    that the Court order BENCH MARK, INC. OF SOUTH WEST FLORIDA to pay its equitable share of any damages incurred by DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 with respect to FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY;

(3)    that the Court order BENCH MARK, INC. OF SOUTH WEST FLORIDA to reimburse DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF

THE JORDYN TRUST DATED MARCH 3, 2005 for all or part of the costs DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 have incurred with respect to FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY and related out-of-pocket damages, together with pre-judgment interest;

(4)     attorneys' fees;

(5)     costs of this action; and

(6)     such further relief as the Court deems appropriate.

## COUNT IV – NEGLIGENT MISREPRESENTATION
### (as to FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY and BENCH MARK, INC. OF SOUTH WEST FLORIDA)

63.     Plaintiffs re-allege each and every allegation contained in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

64.     In the event that Fifth Third and Benchmark did not knowingly and willingly set out to defraud the Plaintiffs, in the very least, Fifth Third and Benchmark negligently misrepresented the above facts to the Plaintiffs.

65.     The misrepresentations made by Defendants were made without knowledge as to their truth or falsity.

66.     The Plaintiffs reasonably and justifiably relied on the misrepresentations, as outlined above.

67.     Fifth Third and Benchmark knew or should have known that the representations they made to Plaintiffs were false.

68.   As a result of the Plaintiffs' reliance on the misrepresentations, they have suffered damages.

69.   Had Fifth Third Bank/Windey and Benchmark not misrepresented the nature of the loans and adhered to established lending policies, the Plaintiffs would have never purchased their respective units.

WHEREFORE, the Plaintiffs, DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005 request judgment as follows:

(1)   rescission of the subject notes and mortgages against FIFTH THIRD BANK, and FIFTH THIRD MORTGAGE COMPANY;

(2)   compensatory damages against FIFTH THIRD BANK, FIFTH THIRD MORTGAGE COMPANY, and BENCH MARK, INC. OF SOUTH WEST FLORIDA, jointly and severally, with regard to the out-of-pocket damages suffered by DAVID & ANN CLARK, PETER GILLIS & MARY PISCITELLI, DONALD & CAMILLE GILLIS, PATRICE DE LANGSDORFF, STEVE & CYNTHIA ENGQUIST, ALEXANDER C. & JENNIFER K. HERWIG, and ALEXANDER C. HERWIG, TRUSTEE OF THE JORDYN TRUST DATED MARCH 3, 2005, together with pre-judgment interest;

(3)   costs of this action; and

(4)   such further relief as the Court deems appropriate.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES IN THE COMPLAINT.

Dated this 5th day of March, 2009.

**/s/ Howard R. Behar**
HOWARD R. BEHAR
Florida Bar No. 054471
Attorneys for Plaintiffs
HOWARD R. BEHAR, PA.
Harbour Centre at Aventura, Suite 900
18851 N.E. 29th Avenue
Aventura, Florida  33180
Telephone: (786) 279-0034
Fax: (786) 279-0033
E-mail: hrb@heharlegal.com